[No. 698.]

## THE STATE OF NEVADA, RESPONDENT, *v.* JOHN B. SMITH, APPELLANT.

ARGUMENT—CLOSE OF BELONGS TO THE STATE.—The privilege of closing the argument in a criminal case belongs to the State.

TESTIMONY OF WITNESSES MAY BE STATED BY THE COURT.—The district judge, upon the trial of a criminal case, has the right to state to the jury, upon their request, the testimony of any witness.

MURDER—INSTRUCTIONS SHOULD DEFINE BOTH DEGREES.—Instructions which clearly define murder in the first degree, and then declare that unless the circumstances bring the case within that definition the defendant cannot be convicted of murder in any degree, are erroneous in this, that they ignore the offense of murder in the second degree.

SELF-DEFENSE—WHEN NOT AVAILABLE IF DEFENDANT IS ASSAILANT.—Instructions which assume that the defendant might be the assailant, and then kill the deceased in order to avoid danger to himself, were properly refused. A man who assails another with a deadly weapon cannot kill his adversary in self-defense until he has fairly notified him by his conduct that he has abandoned the contest; and if the circumstances are such that he cannot so notify him it.is his fault, and he must take the consequences.

IDEM—CHARGE OF THE COURT.—The court charged the jury: " If you believe from the evidence, that the defendant first commenced an assault upon Schooley with a deadly weapon, .in which assault a mortal wound was given to said Schooley by the defendant, and at the time such wound was given the circumstances were such as to excite the fears of a reasonable person that the defendant was about to take the life of said

Schooley, or to do him great bodily harm, then the defendant's fear of danger at said time, from said Schooley, if really entertained by the defendant would not justify the defendant if he took the life of Schooley, for then the defendant would bring such danger upon himself." *Held*, correct.

IDEM.—The court gave the following charge: "If the jury should believe from the evidence, that the defendant first assaulted Schooley, but that the defendant before the mortal shot was given (if such shot was given) really and in good faith endeavored to decline any further assault upon said Schooley, and * * * that after the defendant so declining any further assault * * * the said Schooley attacked the defendant in such a manner that the danger was so urgent and pressing to the defendant that, in order to save his own life, or to prevent his receiving great bodily harm, the defendant inflicted the mortal shot, then the infliction of such shot was justifiable." *Held*, correct.

INSTRUCTIONS—DEFENDANT SHOULD ASK FOR, WHEN. — If the defendant desires the court to charge the jury upon any given point, it is his right and his business to prepare such an instruction, and ask the court to give it.

QUERY.—Do not sections twenty-five and twenty-six of the "Act concerning crimes and punishments" apply exclusively to cases of justifiable self-defense, and section twenty-seven to cases of excusable self-defense?

WOUND MEDIATE CAUSE OF DEATH SUFFICIENT.—It is not necessary that the wound inflicted upon the deceased should have been the immediate cause of death in order to render defendant responsible for its consequences; it is sufficient if it is the mediate cause.

MODIFYING AN INSTRUCTION, WHEN NOT ERRONEOUS. — Where the court in modifying a correct instruction does not alter its sense, the modification cannot be claimed to be erroneous.

INSTRUCTION UNDER INDICTMENT FOR MURDER.—The court, in its charge, instructed the jury that under the indictment the defendant might be convicted of murder in the first or second degree, or manslaughter, and if he was not found guilty of either of these offenses he should be acquitted. *Held*, not to be erroneous.

JUDGMENT, WHEN NOT VOID.—A judgment which does not specify any time for the imprisonment to commence is not void. The better practice is not to fix the commencement of the term, but merely to state its duration and the place of confinement.

APPEAL from the District Court of the Third Judicial District, Esmeralda County.

The court below refused the fourth and fifth instructions asked by the defendant and copied and referred to in the opinion of the court, for the reason that the "evidence shows defendant was assailant, and instructions assume

he might be assailant and then kill to avoid danger to himself."

The facts are stated in the opinion.

*T. W. W. Davies,* for Appellant.

I. In requiring the prosecution to open, the law contemplates a review of the testimony and a statement of what is claimed to have been proved on the part of the State and the law applicable thereto. It contemplates a *bona fide* unmasking and developing of the prosecution's case, to the end that the defendant may be advised as to what is urged before the court and jury against him, and be enabled to shape his reply to meet it. The reading of the statutory definitions of murder, manslaughter and justifiable homicide, by a district attorney, without any statement of what is claimed to have been proved against the defendant, is no such opening of the case as the law requires, and is no argument at all. And then to require the defense to proceed, is virtually requiring the defense to open, and is no such alternating as the statute directs. The defense should have been permitted to reply to the leading and only presentation of the State's case. Such practice as allowing an opening in a criminal case which in truth is no opening, and permitting the State to close by distinguished employed counsel, without opportunity afforded the defense of reply, has become too common in this State; and if it constitute no such error in law as warrants a reversal, it is a denial to the defendant of a substantial right, and is to such an extent reprehensible as to warrant the rebuke and disapproval of this Court.

II. Section 395 of the Criminal Practice Act does not authorize the court to settle or to state what the testimony was that was given on any disputed point.

The defendant asked the court to state to the jury that they must decide this case, if decided at all, by the testimony delivered to them *by the witnesses* and the law delivered by the court. The witnesses should have been recalled and required to state what was their testimony on the points

of disagreement.   Section 12, Article VI of the State Constitution, was never claimed by any lawyer to refer to stating testimony in cases of disagreement, but refers solely to the statement of the testimony by the court in giving its charge to the jury.

If the court had no authority to state the testimony, there was error in its so doing; and if there was error, it is presumed that it resulted to the injury of the defendant. (*People* v. *Ybarra*, 17 Cal. 166; *People* v. *Williams*, 18 Cal. 187.)

III. The court erred in refusing to give the first and second instructions asked by the defendant, as they plainly and correctly stated what constitutes the crime of murder. (Horrigan & Thompson's Cases on Self-Defense, 318; *People* v. *Gibson*, 17 Cal. 283; *People* v. *Ah Fung*, 17 Cal. 377.)

IV. The court erred in refusing to give the third and fourth instructions asked by the defendant, as they correctly state the law.

The necessity to take life that will be justifiable, need not be actual.   It is sufficient if the circumstances that surround the parties at the time be such as to impress the mind of the slayer with a reasonable belief that the necessity is impending.   (*Evans* v. *State*, 44 Miss. 769; *Maher* v. *People*, 24 Ill. 241; *Ripley* v. *State*, 2 Head. (Tenn.) 217; *Meredith* v. *Com.*, 18 B. Monroe, 49; *Pond* v. *People*, 8 Mich. 150; *Lague* v. *Com.*, 2 Wright (Penn.) 265; *Williams* v. *State*, 3 Heiskell, 276; *Lander* v. *State*, 12 Texas, 462; *Morris* v. *Platt*, 32 Conn. 75; *Schnier* v. *People*, 23 Ill. 17; Horrigan & Thompson's Cases on Self-Defense, 245–246, note 139; 1 Bishop Cr. Law, 385; Wharton on Homicide, 407; Wharton's Am. Cr. Law, 3d ed. 456.)

V. The court erred in refusing to give the fifth instruction asked by the defendant, as the same correctly stated the law in cases where there was withdrawal before any mortal blow was given, and was entirely applicable to this case.   (4 Bla. Com. 184; 1 Bish. Cr. L., Sec. 871; 1 Russ. on Crimes, 662; 1 Hall P. C. 479 and 480; *Shorter* v. *People*, 2 Comstock, 193; *Com.* v. *Riley & Stewart*, Thacker's Cr. Cases, 471; *Regina* v. *Smith*, 8 Car. & Pay. 160; *Stoffer* v. *State*, 15 Ohio St. 47.)

VI. The charge of the court was erroneous and manifestly to the great injury of the defendant. The jury are told that if Smith commenced the assault (an unwarrantable hypothesis), and Schooley appeared to be in danger of life or limb, that Smith, under no circumstances, could be justified in defending himself, thus altogether ignoring any effort on the part of Smith to withdraw from the conflict, as well as how Schooley came to be in such apparent danger. (*State* v. *Pierce,* 8 Nev. 303; *Hittner* v. *The State,* 19 Ind. 48.)

VII. The court erred in modifying the seventh instruction asked by the defendant. It is admitted by the respondent that the instruction, as asked, correctly stated the law, but it is claimed that the striking out of the words "the facts constituting," in nowise altered the sense and worked no injury to the defendant. The rule is, if an instruction, as asked, correctly states the law, it is the duty of the court to give it, and it is error to refuse or modify it. Besides, striking out the words, "the facts constituting," is an intimation to the jury that there are no facts constituting the defense as claimed, of which the jury is the sole judge, and about which the court has no right to intimate. (*People* v. *Hobson,* 17 Cal. 424; *People* v. *Hurley,* 8 Id. 390; *People* v. *Ramirez,* 13 Id. 172; *People* v. *Lachanais,* 32 Id. 433; Horrigan & Thompson's Cases on Self-Defense, 318–334.)

VIII. The court in its charge withheld from the jury the consideration of the crime of "assault with a deadly weapon with intent to commit violent injury on the person of another," and "assault and battery." As it was shown by the testimony of the medical witness that the death of Schooley resulted from excessive hemorrhage, which might have been prevented by the simplest means of compress, and the testimony disclosed the fact that there was no effort to stanch the flow of blood, the defendant urged that Schooley did not receive any mortal wound at the hands of the defendant. Under this view the jury were entitled to consider the two crimes mentioned, and by this limitation the jury may have found the verdict of manslaughter, when without this

limitation they may have found him guilty of a less offense. (*People* v. *Gilmore*, 4 Cal. 380; *People* v. *Backus*, 5 Id. 278; *People* v. *Apgar*, 35 Id. 391.)

IX. The judgment is void for uncertainty, in that it fixes no time for the commencement of the term of imprisonment of the defendant.

*J. R. Kittrell, Attorney-General,* for Respondent.

I. There was no error in the court below refusing to permit counsel for defense to have the closing argument of this case. The statute peremptorily requires counsel for the State both to open and conclude the argument. (1 Comp. L. 1979; *State* v. *Pierce*, 8 Nev. 296; *State* v. *Stewart*, 9 Nev. 129.)

II. The first instruction offered by the defendant utterly precluded the jury from finding a verdict for murder in the second degree, for premeditation and deliberation constitute no ingredient of that degree of murder. (1 Comp. L. 2323; *People* v. *Nichol*, 34 Cal. 211.)

III. The third instruction was properly refused because the evidence shows that the defendant was the first to commence the difficulty which led to the killing, and it assumes that he was nowise in fault, and has no reference to the circumstances which induced the belief of imminent danger. (*People* v. *Stonecifer*, 6 Cal. 410.)

The principle stated in the instruction is without qualification and is therefore not law. (*State* v. *Stewart*, 9 Nev. 129.)

IV. The fourth instruction was properly refused for the reason that it makes the belief or impression of the defendant the justification of the act, whether that belief or impression was produced by circumstances sufficient to excite the fears of a reasonable person or not. (*People* v. *Hurley*, 8 Cal. 391.)

V. The modification of the seventh instruction did not in any conceivable manner alter its sense. It did not nor could not have injured the defendant on the trial of his case. Unless such modification be such as to materially change

the meaning of the original instruction, and unless it be affirmatively shown in what way the modification impaired the rights of defendant, the verdict ought not to be disturbed by this Court.

VI. It is not requisite to the validity of a judgment in a criminal case that the commencement of the term of imprisonment be fixed; all that the law requires is to state its duration and the place of confinement,    (1 Comp. L. 2078; *Ex parte Gibson*, 31 Cal. 627; *State* v. *Roberts*, 9 Nev. 44.)

By the Court, BEATTY, J.:

The defendant was indicted for murder, convicted of manslaughter, and sentenced to be imprisoned in the State prison for nine years.   He appeals to this Court, upon various assignments of error, from the judgment and the order denying his motion for a new trial.

The first point urged in his behalf is that " the court below erred in denying the defense the opportunity of replying to the leading, main and only *argument* made by the prosecution in closing."   It appears from the bill of exceptions that on the close of the testimony Davies, counsel for defendant, moved the court "that the opening argument be made by the prosecution, to be followed by the defense, to be resumed by the prosecution, and to be then closed by the defense."   At the time of making the motion he stated that he was the only one of defendant's counsel present, and the only one who desired to address the jury in his behalf. The court denied the motion allowing the district attorney to open the argument, and "Thomas H. Wells, Esq., a non-resident attorney employed to assist the district attorney in the prosecution," to conclude.   To all of which the defendant duly excepted.   We do not understand counsel for appellant seriously to contend that this was error, but we are called upon to rebuke the practice, grown too common it is alleged, of "allowing an opening in a criminal case which, in truth, is no opening, and permitting the State to close by distinguished employed counsel, *without* opportunity afforded to the defense of reply."   There is

nothing in the record to show that this case was unfairly or insufficiently opened by the district attorney, and we have no means of knowing how common or uncommon such a practice may be. We can only say that, so far as it has become the practice, the remedy, so far as it is remediable, lies mainly in the hands of defendants themselves and their counsel. No matter how well satisfied a court may be that a case has been unfairly opened by the State, it has no power to compel the district attorney to say anything more than he has chosen to say. It may, in the exercise of an undoubted discretion, forbid him to raise entirely new points, or read authorities in the close not referred to in the opening, and in proper cases no doubt this will be done. But ordinarily, as we have said, the best remedy for an unfair or insufficient opening of the case by the State is in the hands of the defense. The State ought always to make such an opening argument as it is willing to submit the case on, if the defendant chooses to submit it without argument on his part. And to this extent the State can always be compelled to open the case; for at the close of the opening argument, the defense has only to offer to submit the case in order to compel the prosecution to do one of two things—either to accept the proposition or make a fuller argument. If the proposition to submit is accepted, that ends the matter. If, on the contrary, the prosecution deems it necessary to present its case more fully, the defense may then submit the case or make an argument. If it makes an argument the prosecution is then entitled to close. The privilege of closing the argument belongs to the State in all cases. (*State* v. *Pierce,* 8 Nev. 296.) It is true that the statute provides that in capital cases two counsel may be heard on each side, and that in such case they must alternate. In this case but one counsel appeared for defendant on the argument and the provision for alternating did not apply. But even if there had been two counsel to speak for the defense, the State would still have been entitled to the close, with the additional privilege of a speech to come in between the two arguments for the defense. It is not

usual, we believe, for the prosecution to make such an intermediate argument in capital cases in this State, for the reason, no doubt, that the privilege of making the argument is waived by the State, and the privilege of having it made is waived by the defendant. If the district attorney chooses to make an intermediate argument he has the undoubted right to do so. If he chooses to waive his right, and the defense insists that he shall "alternate," the court can only compel him either to speak or offer to submit the case. Whichever he does the other counsel for defendant may then speak. If he does not speak, the argument is closed; if he does, the State may follow in the close. This is the meaning of the provision for alternating, as we understand it. It does not apply where defendant has but one counsel, and where he has it does not give him the close of the argument but entitles the State to a speech intermediate to his two speeches.

The second point is, that the court erred in stating to the jury, upon their request, after they had retired to consider of their verdict, and a dispute had arisen in regard to the matter, the testimony of one of the witnesses. The Constitution (Art. VI, Sec. 12) provides: "Judges shall not charge juries in respect to matters of fact, but may state the testimony and declare the law." It may be true that the framers of the Constitution did not intend to make the judges arbiters of disputes between jurors as to particular items of testimony, but certainly it is equally true that they have determined in advance that no harm can result from their stating the testimony to the jury, subject to the right of the latter to decide upon its effect, and subject, no doubt, also to their further right to disregard the statement where it differs from their own recollection. It might indeed do harm if a judge misstated disputed testimony, but the possibility of its abuse is no ground for denying the right, and there is an adequate protection against such abuse in the independence of juries and the power of impeachment. There is no suggestion here that the court stated the testimony incorrectly or insufficiently. And moreover, when it

stated the testimony it instructed the jury in writing that they were the judges as to what the testimony was and were not bound by the statement of the court as to matters of fact.    This point arose in precisely the same way in the case of *The People* v. *Ybarra* (17 Cal. 166), where it was held that the court had the right to state to the jury, upon their request, what the disputed testimony was.    We know of no decision to the contrary.

The several succeeding points relate to the charge of the court to the jury, and the refusal and modification of instructions asked by the defendant.    In order to a proper understanding of these points it will be necessary briefly to state the substance of the testimony.

Defendant resided at Mason's Valley, in Esmeralda County, about thirty-five miles from Virginia City.    On the 3d of September last, Schooley, the deceased, and several others, were employed on his place harvesting grain.    They ate dinner in his house, and deceased left his coat there. In the afternoon defendant charged that some of the men had stolen his whisky—an accusation which Schooley resented.    Toward evening, when the harvesting was done, Schooley entered the house, where defendant was, for the purpose of getting his coat.    But one other person was present, and he not all the time, having entered the house after Schooley and left before him.    He testifies: "The first thing I heard Smith say was, 'You are coming in again; after me using you like a gentleman, then you would steal my whisky.'    Schooley said: 'Don't say I stole your whisky.'    Said Mr. Smith: 'Damn you, you did steal my whisky.'"    Witness then left the house, going about fifteen yards before Schooley followed.    Smith came to the door as Schooley was leaving and said he had a notion to pitch into him; that he did not think he was anything but a gas-pipe.    Schooley said: "Pitch in and you will find out." He also told Smith he was an old drunken fool, and he would settle it when he was sober.    He then started away. Smith said: "You call me that, do you?"    Schooley said: "Yes, I do."    Smith said: "I have a notion to make you

take that back." Schooley said: "You have?" Smith said: "Yes, by God, and I will." He then stepped into the house, and immediately reappearing with a gun, cocked it, put it to his shoulder and advanced upon Schooley and the witness, who were standing together in a corral, a short distance from the house. They both ran behind an outhouse that stood in the corral. Here Schooley picked up a willow stick, seven feet long and two or three inches thick. Armed with this, he ran rapidly from behind the house toward the defendant, who had in the meantime approached closely to the house on the other side. As soon as deceased came in view Smith lowered his gun, said he would not shoot, that he was only fooling, and stepped back a little. Schooley, however, continued rapidly to advance, and Smith, when they were nine feet apart, raised his gun and fired. The charge of shot took effect in Schooley's right arm, shattering the bone, and completely severing the brachial artery, two inches from the shoulder. Schooley was conveyed as soon as practicable to a house in the neighborhood, and a messenger was sent to Virginia (the nearest town) for a surgeon. The surgeon, Doctor Conn, arrived the next morning, but having been misinformed of the nature of the wound, was unprovided with amputating instruments. He testifies that when he got there the patient was past help, but that at the time he thought it proper to amputate his arm, as it was beginning to mortify. He sent for another surgeon and instruments, and on the following morning the operation was performed. Schooley died that afternoon from the effects of exhaustion consequent upon the hemorrhage that had taken place immediately ensuing the wound. If a surgeon had been present at the time he received the wound, or if those who were present had known how to apply a field-tourniquet, so as to stop the flow of blood, Schooley's life would probably have been saved. The evidence shows that Schooley received as good care as those present knew how to give him, but they made the mistake of administering brandy, the effect of which is to increase the action of the heart, and accelerate the flow of blood.

The defendant, testifying in his own behalf, gave an account of the shooting differing somewhat from that of the other witnesses. He says Schooley was aggressive and abusive; that he was afraid of him; thought he might have a pistol in his pocket. Schooley was young and strong and quick; he was old and weak and slow. He took his gun, not for the purpose of shooting, but simply to scare Schooley off the place. When he did shoot, after retreating as far as he could, his design was merely to disable Schooley, not to kill him. But even according to his own testimony, he knew, before Schooley left the house, that he had come there for a lawful purpose, that is, to get his coat, and when he took his gun the altercation was at an end and Schooley was in the act of leaving. This being the state of the testimony the defendant asked the following instructions: "1. In cases of murder by ordinary means, the circumstances of the transaction must show that it was done willfully, deliberately, maliciously and premeditatedly, or it is not murder in the first degree. Unless the jury believe from the evidence that defendant killed Schooley from a premeditated design, formed beforehand to effect his death, they cannot find him guilty of murder. That to kill a human being with a premeditated design the mind must have acted in regard to the killing before the killing was committed, and the mind must have settled down, resolved and determined to kill and murder, and that the killing was done with a deliberate and formed design of so doing.

"2. That if the jury believe that defendant killed Schooley on a sudden quarrel without a settled purpose and fixed design so to do, they must not find him guilty of murder."

These instructions were refused, and properly refused, because they do not correctly state the law. As to the first it clearly defines murder in the first degree, and declares that, unless the circumstances bring the case within that definition, the defendant cannot be convicted of murder in any degree. The second is, in our opinion, liable to the same objection. It is argued that, except in those cases where an unintentional killing is made murder because it

is perpetrated in the attempt to commit a felony, an intention to kill is essential to the definition of either degree of murder, and that the expressions "settled purpose" and "fixed design" are merely equivalent to intention. We think they imply deliberation, the settling of a purpose before unsettled, the fixing of a design that had been wavering. They were calculated at least to mislead the jury; and the court, having properly instructed the jury in regard to the definition and degrees of murder, did right in refusing this instruction if it was merely ambiguous. But both instructions were erroneous in another view. The jury might have found, on the testimony, that the defendant did not intend to kill but only to maim the deceased, and might have found that he shot without excuse or justification (as in fact they must have done), and not under such circumstances of mitigation as would have reduced an intentional killing to manslaughter. In such a case it would have been proper to convict him of murder in the second degree. An intention to commit mayhem—a felony—constitutes legal malice; it shows an abandoned and malignant heart; and if in carrying out such an intention death is caused, it is murder in the second degree, though there was no intention to kill. (3 Nev. 451.) The testimony in this case made it necessary to guard against the assumption that an intention to kill is always an essential ingredient of murder.

But even if the instructions could be assumed to have been correct, they only amount to this: that, on the hypothesis assumed, the defendant could not be convicted of murder. He was not convicted of murder, and their refusal did him no harm.

Defendant next asked the court to give the following instructions: "3. If the jury believe from the evidence that the defendant shot and killed Schooley at a time when he (Smith) had reasonable grounds to apprehend a design on the part of Schooley to take his life, or to do him some great bodily injury, and that there was immediate danger of such design being accomplished, the homicide was justifiable, and they will find the defendant *not guilty*.

"4. The necessity to take life that will be justifiable need not be *actual;* it is sufficient if the circumstances surrounding the parties at the time be such as to impress the mind of the slayer with a reasonable belief that the necessity is impending. If, therefore, the jury believe from the evidence in this case, that the circumstances surrounding the defendant at the time of the shooting were such as to excite the fears of a reasonable person, and that the defendant really acted under the influence of such fears, and believed that said Schooley was about to take his life or do him great bodily injury, he, the defendant, was justified in shooting said Schooley, and the jury will so find."

The refusal of the court to give these instructions is claimed to have been error. We think the instructions were properly refused for the reason assigned by the district judge. The defendant having first assailed the deceased had no right to shoot him in self-defense, no matter how urgent the danger, until he had first retreated as far as he safely could, and done all in his power to show his adversary that he declined any further contest. On the testimony the jury might have found that he had so retreated, but the defendant had no right to assume, as these instructions did, that they would so find, for possibly they might have found that his retreat was not for the purpose of getting out of the conflict, but of gaining some fresh advantage; or they might have found that although he was really willing to abandon the contest, he had, by his own act, put it out of his power to manifest his disposition to his adversary in such a manner as to oblige him to desist. A man who assails another with a deadly weapon cannot kill his adversary in self-defense until he has fairly notified him by his conduct that he has abandoned the contest, and if the circumstances are such that he cannot so notify him it is his fault, and he must take the consequences. (15 Ohio State, 51.)

These observations apply also to the next exception of the defendant to the refusal of the court to give his fifth instruction, as follows:

"5. If the jury believe from the evidence that, at the time of the shooting, the defendant had reasonable ground to believe and did believe that he was in imminent peril of his life, or of great bodily injury at the hand of Schooley, and that by reason of the fierceness of the assault he could retreat no further without manifest danger of death or great bodily harm, and that he had retreated as far as he safely could, the shooting was justifiable."

This instruction was properly refused. The jury not only might have found, but we think they ought to have found, on the testimony, that the peril in which the defendant stood resulted from his own fault. He had, without excuse, assailed Schooley with a gun. The most prudent thing Schooley could do under the circumstances, probably, was to close with him as suddenly as possible. Certainly he could not have protected himself by running away if defendant had really intended what he seemed to intend, that is, to shoot. It is true that Schooley might have been warranted in stopping when Smith stepped back and said he did not intend to shoot, but at the same time he might not have been warranted in stopping. It was for the jury to judge whether Smith had sufficiently advertised him that he was in no further danger, and might safely desist from his effort to disarm, or disable, or kill the defendant. If they found that the fierceness of Schooley's attack was justified by the circumstances, then, whether it precluded further retreat on the part of Smith or not, it did not justify him in shooting. This has long been the settled law.

"If A. assaults B. first, and upon that assault B. reassaults A., and that so fiercely that A. cannot retreat to the wall or other *non ultra* without danger of his life; nay, though A. falls upon the ground upon the assault of B., and then kills B., this shall not be interpreted to be *se defendendo,* but to be murder, or simple homicide, according to the circumstances of the case." (Hale's Pleas of the Crown, 482.)

Upon this point, the court in its charge correctly instructed the jury as follows: "If you believe from the evidence that the defendant first commenced an assault upon

Schooley with a deadly weapon, in which assault a mortal wound was given to said Schooley by the defendant, and that at the time such wound was given the circumstances were such as to excite the fears of a reasonable person that the defendant was about to take the life of said Schooley or to do him great bodily harm, then the defendant's fear of danger at said time from said Schooley, if really entertained by the defendant, would not justify the defendant if he took the life of Schooley, for then the defendant would bring such danger upon himself by his own fault," etc.

"If the jury should believe from the evidence that the defendant first assaulted Schooley, but that the defendant, before the mortal shot was given (if such shot was given), really and in good faith endeavored to decline any further assault upon said Schooley, and if the jury should believe from the evidence that, after the defendant so declining any further assault upon said Schooley, that the said Schooley attacked the defendant in such a manner that the danger was so urgent and pressing to the defendant that, in order to save his own life, or to prevent his receiving great bodily harm, the defendant inflicted the mortal shot, then the infliction of such shot was justifiable."

The giving of the first of the above-quoted extracts from the charge of the court is claimed to have been erroneous, because, as it is argued, it amounts to telling the jury that if the defendant made the first assault, he could not, under any circumstances, be justified in the killing, ignoring his effort to withdraw, etc. We think the language of the charge will bear no such construction. Two hypotheses are distinctly stated, with the law applicable to each. The first is, that the defendant commenced an assault upon deceased, *in which assault* Schooley was killed, and at a time when he was in deadly peril from the defendant, and consequently justified in resorting to any necessary measure of defense. This clearly excludes the supposition that defendant had made any sufficient effort to retreat, and the law of that case is correctly given. The second is, that defendant had retreated in good faith, and that Schooley after such

retreat followed up his attack. The law of this case is stated rather favorably than otherwise to the defendant. This charge of the court must be read as it was written— that is, as one whole, the parts mutually dependent and explanatory.

A still further objection is made to the latter part of the foregoing extract from the charge of the court, upon the ground that it requires the danger to the defendant to have been actual and not merely apparent. But it does not require anything of the sort. It tells the jury that under certain circumstances actual danger will justify killing, but it does not tell them that apparent danger under the same circumstances will not justify the slayer. There was a very good reason why it was unnecessary to say anything in regard to apparent as distinguished from actual danger in this connection, and that is, that there was not a particle of evidence to show that there was any false appearance of danger to the defendant at the time of the shooting. Whatever danger was apparent to him was equally apparent to the jury. Aside from this, it is sufficient to say the instruction was correct as far as it went. If the defendant considered it important, under the circumstances, to have the jury told that danger apparent, but in fact unreal, was a justification, it was his right and his business to ask for such an instruction. If he had done so and it had been refused, and there had been any testimony to make it pertinent, we would then have been called upon to decide whether it was correct as a legal proposition. As to this point, since it is not necessary, we express no opinion, but take occasion merely to suggest the query whether our statutory provisions in regard to the right of self-defense are not based upon a recognition of the distinction formerly made between justifiable self-defense and excusable self-defense. Do not sections twenty-five and twenty-six apply exclusively to cases of justifiable self-defense, and section twenty-seven to cases of excusable self-defense? Under our statute the defendant is acquitted whether the homicide appears to be justifiable or merely excusable; but at com-

mon law, if the killing was found merely excusable *se de-
fendendo*, it worked a forfeiture of the defendant's goods,
and he was compelled to sue out his pardon, which was
granted as a matter of course.    This was because the de-
fendant, though excusable, was nevertheless considered
somewhat to blame for engaging voluntarily in the combat,
that resulted in the slaying, notwithstanding he had done
his best to get out of it before taking his antagonist's life.
Acting upon the same idea, it is possible our legislature
meant what they seem to have said, that in such a case the
killing must have been "absolutely" and not merely appa-
rently necessary to the protection of the life or limb of the
slayer, in order to excuse the homicide, and that otherwise
he will be guilty—not of murder, perhaps—but of man-
slaughter.

The sixth instruction asked by the defendant and refused
by the court was to the effect that if the wound received by
Schooley was not necessarily fatal, but resulted from the
neglect of proper appliances, the defendant should be ac-
quitted.    The law upon this point is briefly and correctly
stated in *Commonwealth* v. *Green* (1 Ashmead, 301): "It is
not, however, requisite that the wound should have been
the immediate cause of the death to render Anderson Green
responsible for its consequences; it is sufficient if it is the
mediate cause.    Even when a wound is not mortal in itself,
but for want of proper applications, or from neglect, turns
to gangrene or fever, and the gangrene or fever is the *imme-
diate cause* of the death of the party wounded, the party by
whom the wound is given is guilty of murder or manslaugh-
ter, according to the circumstances of the case."

The defendant asked the following instruction: "7. The
defendant is *not* required to establish the facts constituting
his defense—justifiable homicide—either by proof beyond
a reasonable doubt, or by proof preponderating," etc.

The court struck out the words, "the facts constituting,"
and gave the instruction as modified.    This is claimed to
have been error.    We think the instruction might properly
have been given as requested, but we do not think the de-

fendant was injured by the modification, as it did not alter the sense of the passage in which it occurs. The defendant's counsel argues that the striking out of these words amounted to an intimation that there were no "facts constituting a defense." This, unfortunately, is an argument which cuts both ways. If the striking out of these words was an intimation that there were no facts constituting a defense, the putting them in was an intimation that there were facts constituting a defense. If so, it was a good reason for striking them out.

The court, in its charge, instructed the jury that, under the indictment, the defendant might be convicted of murder in the first or second degree, or manslaughter, and that, if he was not found guilty of either of these offenses, he should be acquitted. It is claimed that this was erroneous, because, under the indictment and testimony, he might have been convicted of "assault with a deadly weapon," etc., or "assault and battery," or "assault." Whether or not, under the peculiar provisions of our statute an indictment for murder would support a conviction for either of the offenses named, the court are not agreed, and as the question was not argued, and its determination is not essential, we pass it over. We are clear that under the testimony in this case the defendant was guilty of some degree of homicide, or he was guilty of nothing. The only theory upon which he could have been acquitted of the homicide and convicted of "assault," etc., is that the wound inflicted was not the cause, mediate or immediate, of the death; a theory which derives no countenance from the testimony. Moreover, admitting the testimony on this point to have been different, the defendant asked for this very instruction, and upon his view of the law it is an error in his favor. If the jury had found that the wound inflicted by him did not cause the death of Schooley, under this instruction he must have been acquitted, whereas under such an instruction as he contends ought to have been given he would have been convicted of assault and battery. He complains, in other words, that the court gave him a chance to escape all pun-

ishment that ought not to have been allowed him, for we must assume that a jury will not convict of a higher offense where they are not satisfied that it has been established beyond a reasonable doubt, because under the charge of the court they are precluded from finding the defendant guilty of a lower offense.

Finally, it is claimed that the judgment is void because it does not specify any time for the imprisonment to commence. On this point we content ourselves with a quotation from *Ex parte Gibson* (31 Cal. 626-7): "If it is a judgment of imprisonment, the commencement and duration of the time and the place of confinement ought to be stated with certainty, if the commencement is stated at all; otherwise the judgment may be absolutely void. But the better practice is not to fix the commencement of the term, but merely to state its duration and the place of confinement."

Upon this review of the various questions raised upon the appeal we are of the opinion that the judgment and order appealed from should be affirmed.

It is so ordered.