[No. 2171]

## STATE OF NEVADA, RESPONDENT, *v.* WILLIAM PAPPAS, APPELLANT.

### [152 Pac. 571]

1. HOMICIDE—ASSAULT WITH INTENT TO KILL—INTENT.

In a prosecution for assault with intent to kill, the specific intent being an element of the offense, no presumption of law can arise which will decide that question; hence a charge that, if accused assaulted another with a deadly weapon in a manner calculated to produce death, the law presumes such was his intention is erroneous.

2. CRIMINAL LAW—EVIDENCE—RES GESTÆ.

Where the prosecuting witness, when first asked who stabbed her, gave an equivocal answer, and stated that others ought to know the man, her next charge that accused was guilty, made forty-five minutes after the occurrence, when her wounds had been dressed and she was under no particular excitement, is not admissible as part of the *res gestæ*, there having been sufficient time to fabricate.

APPEAL from Fifth Judicial District Court, Nye County; *Mark R. Averill,* Judge.

William Pappas was convicted of assault with intent to kill. From the judgment and an order denying new trial, he appeals. **Reversed and remanded.**

*H. H. Atkinson,* for Appellant:

Testimony as to statements not a part of the *res gestæ* is generally regarded as hearsay, and is carefully excluded except in rare cases. (*Stairn* v. *Nelson,* 65 Kan. 419, 70 Pac. 355.)

Statements of the complaining witness, made after the alleged assault, were no part of the *res gestæ;* to be such, they must be an essential part of or spring spontaneously from the transaction itself. (*State* v. *Daugherty,* 17 Nev. 376, 30 Pac. 1074.)

*Geo. B. Thatcher,* Attorney-General, for Respondent:

The testimony of the prosecuting witness, as testified to by the witness Evans, is part of the *res gestæ,* and the admission of such testimony is within the discretion of the trial judge. (*State* v. *Ah Loi,* 5 Nev. 100; *State* v.

*Ferguson,* 9 Nev. 119; Wigmore on Evidence, sec. 1745; *Coffin* v. *Bradbury,* 3 Idaho, 786; *McPike* v. *Commonwealth,* 3 Cush. 184; *People* v. *Simpson,* 48 Mich. 479; *Kirby* v. *Commonwealth,* 77 Va. 688; *State* v. *Smith,* 26 Wash. 357.)

By the Court, COLEMAN, J.:

**1.** The defendant was charged with the crime of assault with intent to kill. Upon the trial the jury returned a verdict of guilty, and from an order denying a motion for a new trial and the judgment defendant appeals.

Error is assigned to the giving by the court of instruction No. 2 which reads:

"The law holds the defendant accountable for the natural and probable consequences of his acts, when unlawful, regardless of the question of whether he accomplished his purpose or not; and, if you believe from the evidence, beyond a reasonable doubt, that the defendant did assault Lillian Frazier with a dangerous weapon in such a manner as was calculated to produce the death of Lillian Frazier, the law presumes that such was the defendant's intention, and throws upon him the burden of showing facts in mitigation, justification, or excuse."

The portion of the instruction to which the objection goes is:

"The law presumes that such was defendant's intention and throws upon him the burden of showing facts in mitigation, justification, or excuse."

In the case of *People* v. *Landman,* 103 Cal. 577, 37 Pac. 518, a similar instruction was under consideration, and the court said:

"When a specific intent is an element of the offense no presumption of law can ever arise that will decide this question of intent; and therein is found the vice of the present instruction."

"We believe the law is correctly enunciated in the foregoing extract. Other authorities supporting this view are: *Roberts* v. *People,* 19 Mich. 401; *Patterson* v.

*State*, 85 Ga. 131, 11 S. E. 620, 21 Am. St. Rep. 152; Lawson Pres. Ev., p. 271; *People* v. *Mize*, 80 Cal. 42, 22 Pac. 80. See, also, 12 Cyc., pp. 152, 153, 154.

Some authorities hold that while it is error to instruct the jury that the "law presumes" a defendant intended the natural consequences of his act, they hold that it is not error to instruct that the jury may presume that a defendant intended to accomplish the natural consequences of his act. But as this question is not before us, we express no opinion concerning it.

It is also contended that the trial court erred in giving the following instruction:

"If a witness examined before you has wilfully sworn falsely in a material manner, you may disregard the entire evidence of such a witness, except in so far as it is corroborated by other competent evidence."

In the very recent case of *Zelavin* v. *Tonopah Belmont Development Co.*, 39 Nev. 1, 149 Pac. 188, we commended an instruction which is substantially the same as the one complained of here, the only material difference being that in the one in that case the word "credible" was used instead of "competent." As will be readily seen, there is a marked difference between the two words. But appellant objects to the instruction quoted in the Zelavin case. That instruction is not only one which has found favor in this court, but in other courts (38 Cyc. 1733), and, we believe, with the bench and bar of the state generally. The only court which has emphatically repudiated such an instruction is that of Oklahoma, as appears from the Williams case, cited by us in the Zelavin case, *supra*. In view of the fact that this case must be reversed for other reasons, and the further fact that the instruction given will not, in all probability, be given upon another trial of the case, it is not necessary that we determine whether or not error was committed in the instruction given by the court below.

**2.** It is insisted on the part of the appellant that the trial court erred in admitting in evidence as a part of the *res gestæ* the testimony as to the statement made by

the prosecuting witness, as testified to by the witness
Evans. The prosecuting witness, about forty-five min-
utes after she had been stabbed, in response to inquiries
of witness Evans, stated that it was defendant (giving
his name) who had assaulted her, and she described him.
We believe that the correct rule applicable to this ques-
tion was declared by this court in *State* v. *Ah Loi*, 5 Nev.
99, where it is said:

"The position taken by counsel for the prisoner upon
the first assignment is clearly not maintainable upon the
authorities. The statement made, by the prosecuting
witness that she had been robbed—a very few minutes
after the crime was committed, and whilst she was still
weeping because of the loss of the money taken from
her—was undoubtedly admissible as a part of the *res
gestæ*, and confirmatory of the evidence given by her.
In the case of *Commonwealth* v. *McPike*, 3 Cush. 181, 50
Am. Dec. 727, the Supreme Court of Massachusetts ruled
that the statement made by a person who had received
a mortal wound a few minutes before, as to the cause
and manner of the injury, was admissible as being in the
nature of the *res gestæ;* Dewey, J., saying, in delivering
the opinion: 'That the period of time at which these acts
and statements took place was so recent after the receiv-
ing of the injury as to justify the admission of the evi-
dence as a part of the *res gestæ*. In the admission of
testimony of this character much must be left to the
sound discretion of the presiding judge. So where a
man was killed in consequence of having been run over
by a cabriolet, it was held, on an indictment against the
driver for manslaughter, that what the man said imme-
diately after receiving the injury was admissible in evi-
dence. (6 C. & P. 325.) To make declarations a part
of the *res gestæ*, it is true, it is said they must be
contemporaneous with the main fact; but in order to
be contemporaneous, they are not required to be pre-
cisely concurrent in point of time. If the declara-
tions spring out of the transaction—if they elucidate it,
if they are voluntary and spontaneous, and if they are

made at a time so near to it as reasonably to preclude the idea of deliberate design—they may be regarded as contemporaneous. (6 C. & P. 325. See, also, *Mitchum* v. *State*, 11 Ga. 615; Corwin & Hill's Notes to Phillips's Evidence, note 432.) Undoubtedly such statements should be received with great caution, and only when they are made so recently after the injury is received, and under such circumstances as to place it beyond all doubt that they are not made from design or for the purpose of manufacturing evidence. Hence, from the very nature of the thing, very much must be left to the discretion of the presiding judge. Here the statement was made immediately after the robbery, and under circumstances which made it eminently proper to admit it. Supported as this ruling by the court below is by the general current of decisions, it must be sustained.' "

The case of *State* v. *Daugherty*, 17 Nev. 376, 30 Pac. 1074, was reversed because of the admission by the trial court of a statement made by the person assaulted seven or eight minutes after the assault was made; the court, after quoting from several authorities, saying:

"The evidence was the narration of a past occurrence, and was incompetent."

Chamberlayne, in his Modern Law of Evidence, at section 3006, lays down the rule for determining whether a statement should be rejected, as follows:

"Whether the circumstances under which a declaration was made are such as to make it reasonably probable that it was spontaneous presents a preliminary question for the determination of the trial judge. The burden is upon the proponent to show the essential facts. Should the judge be of opinion that an opportunity for deliberation and reflection has been afforded to the speaker, it will be assumed to have been utilized, the declaration being rejected."

Professor Jones lays down the rule to be:

"*   *   * Hence, if there is reason to suppose that

the declarations are not the natural and spontaneous utterance of the declarant, but that they are premeditated or designed for a purpose, they are inadmissible." (2 Jones on Evidence, sec. 351.)

"* * * The utterance, it is commonly said, must be 'spontaneous,' 'natural,' 'impulsive,' 'instinctive,' generated by an excited feeling which extends without let or breakdown from the moment of the event they illustrate." (3 Wigmore on Evidence, sec. 1749.)

The same learned author, at paragraph (b) of section 1750, says:

"The utterance must have been before there has been time to contrive and misrepresent, *i. e.*, while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance. This limitation is in practice the subject of most of the rulings."

The witness James Welch testified that he was one of the first persons to reach the prosecuting witness after she had been stabbed, and that:

"There was somebody else there; was asking her at the time I was. One of the girls said, 'Who was it?' and she [prosecuting witness] says, 'Why, you know that fellow,' and she described him, about the suit and shoes, and scar over one of his eyes, or up on his forehead there was a scar."

This is all the evidence in the record as to any description of the assailant alleged to have been given by the prosecuting witness until the witness Evans appeared, about half an hour later. In reply to the questions of Welch and "one of the girls," she did not undertake to give the name of her assailant, nor does it appear whether or not her other description of him corresponded to that which she later gave to Evans. On direct examination the prosecuting witness testified:

"Q. Now, did you—do you know the defendant Pappas? A. Yes, sir.

"Q. How long had you known him? A. I met him the night before he stabbed me, first.

"Q. What night was that?   A. Thursday night was the first night I ever met him."

On cross-examination, the prosecuting witness testified:

"Q. The first time that you saw Pappas was in the Casino that evening, Thursday evening [night before cutting], and you brushed by him, did you?   A. Yes, sir. * * *

"Q. Never seen him before?   A. No doubt he had seen me, I don't know; but I never knew him."

To the writer there is about this entire case something of a mystery. It appears that the defendant and the prosecuting witness never spoke to each other before Thursday night, and he is charged with having assaulted her about 3 o'clock on the following Saturday morning, in her crib, without a quarrel or trouble of any kind between them. From the testimony of the prosecuting witness, robbery could not have been the assailant's motive. On the other hand, what could have availed the prosecuting witness to falsely accuse the defendant? We can conceive of no advantage which could have accrued to her in falsely accusing the defendant. It is urged that the defendant was accused for the purpose of shielding another. Such may have been the case.

Another particular thing is her testimony to the effect that she had not known the defendant more than about thirty-four hours before she was stabbed, yet when asked by Welch and one of the girls, "Who did the cutting?" she failed to give defendant's name (though giving it later to Evans), and stated, "Why, you know that fellow." If the prosecuting witness had known her assailant for only about thirty-four hours, and the only times she had seen him being when she brushed past him in the Casino dance-hall, and in the privacy of her crib, in what position was she to speak so confidently that others knew him? It looks as though she was at that time endeavoring to conceal the identity of her assailant. If such was the case, it is clear that her subsequent statement to Evans should not have been admitted.

We have adverted to the testimony at this juncture because it seems to emphasize the force of the rule laid

down by the authorities. Did the prosecuting witness have an opportunity for deliberation and reflection? She was asked flatly by Welch and one of the girls who her assailant was, and, so far as it appears from the record, she gave them no clue to his identity. She must have realized that she would be urged by the officers to disclose the identity of her assailant; she could reasonably anticipate that an officer would seek such information. She certainly not only had an opportunity for deliberation and reflection, but from the questions of Welch and the girl it was forcibly brought to her attention that she would be urged to speak. The statement to Evans having been made about forty-five minutes after the cutting, and after the conversation with Welch and one of the girls, and after the doctor had sewed up her wounds, when, so far as it appears, she was laboring under no excitement, and when she was in a frame of mind to speak deliberately, we feel satisfied that it cannot be said to be a part of the *res gestæ*, and consequently the objection to it should have been sustained.

As we view the evidence in this case, it wholly fails to establish an alibi. One of the witnesses called for that purpose testified that he left the defendant in his room about 10 o'clock the night of the cutting, and did not see him again that night, and the other one testified to an alleged occurrence at the Casino dance-hall at a later hour, but that he did not see him after 11:30 o'clock, while the undisputed evidence shows that the cutting took place about 3 o'clock in the morning. The testimony of the alibi witnesses could have been true, and still the defendant might have been at the crib of the prosecuting witness at the time of the cutting.

For the errors pointed out, the judgment is reversed, and a new trial ordered.

NORCROSS, C. J.: I concur.

MCCARRAN, J., concurring:

I concur in the order, and so much of the opinion as deals with instruction No. 2, given by the trial court. The impropriety of this instruction has long since been

established by the decision of this court. (*State* v. *Newton*, 4 Nev. 410; *State* v. *Rodriguez*, 31 Nev. 342, 102 Pac. 863.) The giving of this instruction was sufficient error to reverse this case.